**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PENELOPE HOUSE, INC.** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **vs.** | * | **CIVIL ACTION NO.:** |
| | * | |
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **Defendant** | * | |

## COMPLAINT

PENELOPE HOUSE, INC. ("PENELOPE HOUSE") brings this action against the United States pursuant to 26 U.S.C. § 7422, for a refund of internal revenue taxes totaling $1,026,357.70 (plus interest) owed to it (the "ERC refunds") – and wrongfully denied by the Internal Revenue Service ("IRS") – as Employee Retention Credits ("ERC").[1] Under the Coronavirus Aid, Relief, and Economic Security Act, PL 116-136, March 27, 2020, 134 Stat 281 ("CARES Act") and Internal Revenue Code § 3134, which created the ERC, PENELOPE HOUSE is entitled to ERC refunds for the tax periods ending June 30, 2020 ("Q2 2020"), December 31, 2020 ("Q4 2020"), as well as March 31, 2021 ("Q1 2021"), June 30, 2021 ("Q2 2021"), and September 30, 2021 ("Q3 2021") because it experienced a partial suspension of its operations due to governmental orders issued during the pandemic.

## NATURE OF ACTION

1. Plaintiff files this civil action under I.R.C. § 7422 for the recovery of employment taxes, including the refundable excess credit (together with statutory interest and any appropriate attorney fees), authorized to be paid to Plaintiff under I.R.C. § 3134 but wrongfully denied by the

[1] Employee Retention Credits or ERC are also interchangeably referred to as Employee Retention Tax Credits or ERTC.

IRS. This Complaint is timely under 28 U.S.C. § 2401 and under I.R.C. §§ 6532 and 7422, as Plaintiff's ERC claims were duly filed more than 6 months prior to the filing of this Complaint[2], and Defendant denied Plaintiff's ERC claim for Q3 2021 less than two years ago.[3] *Id*.

**PARTIES**

2. Plaintiff PENELOPE HOUSE, INC., is a shelter for the victims of domestic violence and their families. Plaintiff's principal place of business is in Mobile County, Alabama.

3. The Defendant is the United States of America.

**JURISDICTION AND VENUE**

4. Jurisdiction in this Court is proper under 28 U.S.C. §§ 1331, 1340, and 1346(a)(1), and under 26 U.S.C. (I.R.C.) § 7422.

5. Venue in this Court is proper under 28 U.S.C. § 1402(a)(2) and 1391(e)(1), as Plaintiff's principal place of business is located in this judicial district.

**THE EMPLOYEE RETENTION CREDIT**

6. Beginning in 2020, the COVID-19 virus created a global pandemic that swept through all fifty states and resulted in governmental orders to address the pandemic that disrupted the United States' local and national economies. Those orders formed a nexus of federal, state, and local government mandates that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings with the objective to limit the spread of COVID- 19. The governmental response to that public health emergency involved historically unprecedented measures, including lock down orders, social distancing mandates, and forced business closures. The economic effects of those policies were profound. Deemed the "greatest threat to prosperity and well-being the US

[2] See Exhibit "A"-Plaintiff's 941X for Q2 2020, Q3 2020, Q4 2020, Q1 2021, Q2 2021, Q3 2021, and Form 2848 Power of Attorney that was attached to each 941X.

[3] See Exhibit "B", IRS Letter 105C of Disallowance for Q3 2021, dated October 10, 2024.

has encountered since the Great Depression[,]" the estimated cumulative financial costs of COVID-19 were forecast at $16 trillion.[4]

7. In response to the COVID-19 pandemic, the federal government enacted sweeping economic measures to assist American businesses and citizens, including the CARES Act, enacted in March 2020. Section 2301 of the CARES Act created the ERC.

8. The ERC is a broad-based, fully refundable tax credit designed to stimulate economic recovery, support job retention, encourage business sustainability, and mitigate the impacts on U.S. businesses from the unprecedented challenges posed by the pandemic. Congress intended for the credit to be broadly applicable to help businesses survive a historic pandemic that disrupted the global economy. The credit is available to certain eligible employers for the last three quarters of 2020 and for the first three quarters of 2021.

9. Under the statute, an employer is eligible to claim an ERC if it carried on a trade or business during the quarter at issue and satisfies just one of three potential prongs for eligibility: (1) declining gross receipts[5]; (2) full or partial suspension of operations due to government orders, or (3) recovery startup business[6]. CARES Act § 2301(c)(2); I.R.C. § 3134(c)(2).[7]

---

[4] Alvin Powell, *What might COVID cost the U.S.? Try $16 trillion, The HARVARD GAZETTE, Nov. 10, 2020*. https://news.harvard.edu/gazette/story/2020/11/what-might-covid-cost-the-u-s-experts-eye-16-trillion/.

[5] To meet the "declining gross receipts test" for the year 2020, a business must show that for the 2020 quarter being claimed for an ERTC, that the gross receipts of the business are "less than 50% of the gross receipts for the same calendar quarter in the prior year (2019)." CARES Act § 2301(c)(2)(B)(C). For 2021, under the "declining gross receipts" test, businesses can qualify as an employer eligible to claim the ERC credits during the first three quarters of 2021 if, "the gross receipts (within the meaning of section 448(c)) of such [Plaintiff] for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019." I.R.C. § 3134(c)(2)(ii)(A)(II).

[6] Plaintiff is not a "recovery startup business" as defined under I.R.C.§3134(c)(2)(A)(ii)(III), and so it does not claim ERC credits thereunder.

[7] The current version of I.R.C. § 3134 became effective on November 15, 2021, and, as relevant here, is identical to the version of I.R.C. § 3134 in effect from March 11, 2021, to November 14, 2021, and to the version of the CARES Act in effect from January 1, 2021, to March 10, 2021. For ease of reference, this Complaint cites I.R.C. § 3134 when discussing 2021 ERC requirements.

10. Plaintiff PENELOPE HOUSE gave notice to the IRS and claimed ERC credits for Q2 2020, Q3 2020, Q4 2020, Q1 2021, Q2 2021, and Q3 2021. The IRS denied the claim for Q3 2021 and has paid the Q3 2020 claim. The denied Q3 2021 claim, as well as the others for which the IRS has taken no action, are the subject of this suit for refund. PENELOPE HOUSE's claim was based on its full or partial suspension of operations due to government orders. "Eligible employers" are employers that carry on a trade or business or tax-exempt organizations that meet certain criteria. CARES Act § 2301(c)(2)(A)(i) & (C); I.R.C. § 3134(c)(2)(A)(i) & (C).

11. The amount of ERC is not limited to the amount of employment taxes the employers paid, and against which the credit is applied. Rather, if the amount of the credit exceeds the applicable employment taxes for the calendar quarter, "such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)." CARES Act § 2301(b)(3); I.R.C. § 3134(b)(3).

12. Plaintiff PENELOPE HOUSE is an eligible employer as defined under the CARES Act § 2301(c)(2) and I.R.C. §3134(c)(2)(A)(i) and (ii)(I) and (C).

**The Suspension Test**

13. Plaintiff qualifies under the second ERC prong for eligibility -- full or partial suspension of its operations due to governmental orders.

14. Under this prong, a Plaintiff like PENELOPE HOUSE is eligible to claim the credits if, "the operation of [Plaintiff's] trade or business [was] fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." CARES Act § 2301(c)(2); I.R.C. § 3134(c)(2)(A)(ii)(I). PENELOPE HOUSE clearly meets this prong. A full or partial suspension does not require the

employer to shut down its operation completely for any period of time.[8] The COVID related governmental order, per the IRS, need only have caused "more than a nominal effect" on the businesses' "operations" in order to qualify the employer for the ERC. *See* IRS Notice 2021-20 *(Answer 17)*.

15. In defiance of the clear language of the Code and the will of Congress, the IRS ignored the tremendous disruptions to PENELOPE HOUSE and the full or partial suspension of its operations brought on by COVID-related governmental orders. PENELOPE HOUSE made a valiant effort, despite all of the COVID protocols in place, to maintain its operations as a safe haven for families seeking shelter from abusive situations but it still suffered a partial suspension of operations during COVID and is entitled to its claimed ERC. In March 2020, PENELOPE HOUSE had to undertake major changes to its operations which normally include: providing emergency services (including shelter) to victims of abusive situations, providing a thrift shop to support its efforts to help domestic abuse victims, assisting clients within the court system who have experienced life-threatening situations, educating young people on abuse and providing other outreach opportunities, and assisting with homework as needed for victims' children. The shelter has a commercial kitchen and provides transitional living spaces for victims and families where they can live rent free for up to two years.

16. PENELOPE HOUSE serves families in Mobile, Washington, Clarke, and Choctaw Counties with victims and families occasionally hailing from other Alabama counties and states.

17. The pandemic changed the way PENELOPE HOUSE operated entirely.

[8] In fact, IRS Notice 2021-20 interprets a partial suspension to occur if the employer's operations "are subject to modification due to a governmental order (for example, to satisfy distancing requirements), [then] such a modification of operations is considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has more than a nominal effect on the business operations under the facts and circumstances." IRS Notice 2021-20 *(Answer 17)*.

18. PENELOPE HOUSE was forced, due to governmental orders to socially distance, and to quarantine and isolate its clients. During the pandemic, the number of clients the shelter served was drastically reduced. Pre-pandemic, if needed, the shelter could house up to 4 women in a room. This was not possible during the pandemic due to governmental orders limiting interaction. Pre-pandemic, if the census was high, multiple families could share a living space, but this was not possible during the pandemic due to governmental orders.

19. During the pandemic, PENELOPE HOUSE followed CDC and Mobile County Health Department regulations which called for strict quarantining, testing and distancing of staff and clients. The shelter also could not care for its victims in a way which provided the best services possible to victims. For example, victims could only generally communicate with staff from their individual rooms with a shelter-issued phone because the victims could not enter staff offices. In-person victim meetings are an important part of getting to know victims and assisting victims and their families. Victims could only meet with staff in a boardroom. This lack of frequent meetings led to delays in the work being accomplished – i.e. trying to get the victims back on their feet with jobs and permanent shelter.

20. Additionally, work for the victims and permanent placements for housing were difficult to come by during the pandemic, causing major delays in transitioning the victims out of the shelter. Families also did not participate in communal meals and could not use communal bathrooms. Cleaning protocols for the shelter were changed and increased in frequency dramatically. Cleaning supplies were difficult to come by and the shelter experienced major delays in the receipt of goods and services due to supply chain issues. The children the shelter served also were impacted not only in the way they were able to play with others but also in other ways, such as the coordination of online learning (from their home school) which brought on its own set of

challenges.

21. Volunteers could not be heavily used as they were pre-pandemic, causing increased employee needs in an already understaffed environment. As late as the Spring of 2022, the shelter still could not be utilized to capacity due to adherence to CDC guidelines.

22. All of PENELOPE HOUSE's Covid protocol responses were a result of it following governmental orders issued throughout the pandemic years 2020, 2021 and even continuing into 2022, but the IRS ignored these facts and wrongfully denied PENELOPE HOUSE's ERC claim for Q1 2023 and has failed to timely act on the other quarters applied for.

23. Eligibility under the CARES Act § 2301(c)(2) and I.R.C. § 3134(c)(2)(A)(ii)(I) requires no financial element whatsoever.

24. The CARES Act § 2301(c)(2) and I.R.C. § 3134(c)(2)(A)(ii)(I) do not require eligible employers to have suffered any decline in gross receipts.

25. As detailed above, Plaintiff's operations were partially suspended due to government orders that meet the statutory criteria for the claimed quarters in 2020 and 2021.

26. Because Plaintiff PENELOPE HOUSE's operations were partially suspended due to government orders that meet the statutory criteria for the claimed quarters in 2020 and 2021, PENELOPE HOUSE is entitled to its claimed, but wrongfully denied, ERC, plus interest and attorney fees and costs.

**PENELOPE HOUSE**

27. PENELOPE HOUSE is a 501(c)(3) non-profit corporation that operates a shelter for the victims of domestic violence and their families. Plaintiff's principal place of business is in Mobile County, Alabama.

28. In its denial for Q3 2021, the IRS stated "[o]ur records indicate there were no

government orders related to COVID-19 in effect during the quarter(s) you claimed ERC which could have fully or partially suspended your trade or business." (See Exhibit "B").

29. Plaintiff asserts that there were numerous government orders that had the effect of suspending more than a nominal portion of Plaintiff's business.

30. As a result of the conditions described above, Plaintiff's business operations were fully or partially suspended due to orders from governmental authorities in Q2 2020, Q3 2020, Q4 2020, Q1 2021, Q2 2021, and Q3 2021.

**Second Quarter 2020**

31. On or about May 18, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q2 2020. ("Q2 2020 Form 941-X").

32. Line 18a of the Q2 2020 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $27,540.04.

33. Line 26a of the Q2 2020 Form 941-X reported that Plaintiff's refundable portion of ERC was $174,722.47.

34. Line 30 of the Q2 2020 Form 941-X reported $385,301.02 in qualified wages for the ERC.

35. Line 31a of the Q2 2020 Form 941-X reported $19,224.00 in qualified health plan expenses for the ERC.

36. Based upon the foregoing, Plaintiff timely claimed an ERC for Q2 2020 in the amount of $202,262.51.

37. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q2 2020.

**Fourth Quarter 2020**

38. On or about May 18, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q4 2020. ("Q4 2020 Form 941-X").

39. Line 18a of the Q4 2020 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $26,869.81.

40. Line 26a of the Q4 2020 Form 941-X reported that Plaintiff's refundable portion of ERC was $10,430.26.

41. Line 30 of the Q4 2020 Form 941-X reported $72,373.69 in qualified wages for the ERC.

42. Line 31a of the Q4 2020 Form 941-X reported $2,226.45 in qualified health plan expenses for the ERC.

43. Based upon the foregoing, Plaintiff timely claimed an ERC for Q4 2020 in the amount of $37,300.07.

44. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q4 2020.

**First Quarter 2021**

45. On or about May 18, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q1 2021. ("Q1 2021 Form 941-X").

46. Line 18a of the Q1 2021 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $22,610.03.

47. Line 26a of the Q1 2021 Form 941-X reported that Plaintiff's refundable portion of

ERC was $224,676.55.

48. Line 30 of the Q1 2021 Form 941-X reported $335,003.75 in qualified wages for the ERC.

49. Line 31a of the Q1 2021 Form 941-X reported $18,262.80 in qualified health plan expenses for the ERC.

50. Based upon the foregoing, Plaintiff timely claimed an ERC for Q1 2021 in the amount of $247,286.58.

51. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q1 2021.

**Second Quarter 2021**

52. On or about May 18, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q2 2021. ("Q2 2021 Form 941-X").

53. Line 18a of the Q2 2021 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $26,694.92.

54. Line 26a of the Q2 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $250,51853.

55. Line 30 of the Q2 2021 Form 941-X reported $378,717.62 in qualified wages for the ERC.

56. Line 31a of the Q2 2021 Form 941-X reported $17,301.60 in qualified health plan expenses for the ERC.

57. Based upon the foregoing, Plaintiff timely claimed an ERC for Q2 2021 in the amount of $277,213.45.

58. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q2 2021.

**Third Quarter 2021**

59. On or about May 18, 2023, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q3 2021. ("Q3 2021 Form 941-X").

60. Line 18a of the Q3 2021 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $5,747.45.

61. Line 26a of the Q3 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $256,547.63.

62. Line 30 of the Q3 2021 Form 941-X reported $360,289.26 in qualified wages for the ERC.

63. Line 31a of the Q3 2021 Form 941-X reported $14,418.00 in qualified health plan expenses for the ERC.

64. Based upon the foregoing, Plaintiff timely claimed an ERC for Q3 2021 in the amount of $262,295.08.

65. By letter dated October 10, 2024, the IRS issued a Statutory Notice of Disallowance ("Letter 105C") with respect to Plaintiff's claim for ERC for Q3 2021.

**CAUSES OF ACTION**

66. Pursuant to I.R.C. § 7422, a taxpayer may file a civil action against the United States for the recovery of taxes after a claim for refund has been duly filed with the Secretary.

67. Pursuant to I.R.C. § 6532, no suit for refund shall begin before the expiration of six months from the date of filing the claim for refund, nor after the expiration of two years from the

date the Secretary notifies the taxpayer that its claim has been disallowed.

68. Plaintiff satisfied each of the requirements under I.R.C. § 7422 and § 6532 prior to bringing this action.

69. Plaintiff qualified for the ERC in Q2 2020, Q3 2020, Q4 2020, Q1 2021, Q2 2021, and Q3 2021 because its business operations were partially suspended.

70. The IRS paid Plaintiff's ERC claim for Q3 2020.

71. The IRS issued a Letter 105C notifying Plaintiff that its claim for Q3 2021 had been disallowed.

72. The IRS has not issued a Letter 105C for Q2 2020, Q4 2020, Q1 2021 or Q2 2021.

73. Plaintiff's claims for Q2 2020, Q4 2020, Q1 2021, Q2 2021, and Q3 2021 have been pending for more than six months.

74. Plaintiff's Complaint herein is being filed less than two years after the Letter 105C was issued disallowing the Plaintiff's ERC claim for Q3 2021.

75. Plaintiff is entitled to the full amount of ERC claimed, together with interests pursuant to I.R.C. § 6611, as well as reasonable attorney fees and legal costs associated with this cause of action, pursuant to 28 U.S.C § 2412 and/or I.R.C. § 7430.

**Count One**
**Q2 2020 Refund Claim**

76. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

77. Plaintiff is an eligible employer qualified to receive $202,262.51 of ERC in Q2 2020.

78. On or about May 18, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q2 2020 in the amount of $202,262.51.

79. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $202,262.51, along with statutory interest.

**Count Two**
**Q4 2020 Refund Claim**

80. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

81. Plaintiff is an eligible employer qualified to receive $37,300.07 of ERC in Q4 2020.

82. On or about May 18, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q4 2020 in the amount of $37,300.07.

83. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $37,300.07, along with statutory interest.

**Count Three**
**Q1 2021 Refund Claim**

84. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

85. Plaintiff is an eligible employer qualified to receive $247,286.58 of ERC in Q1 2021.

86. On or about May 18, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q1 2021 in the amount of $247,286.58.

87. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $247,286.58, along with statutory interest.

**Count Four**
**Q2 2021 Refund Claim**

88. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

89. Plaintiff is an eligible employer qualified to receive $277,213.45 of ERC in Q2 2021.

90. On or about May 18, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q2 2021 in the amount of $277,213.45.

91. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $277,213.45, along with statutory interest.

**Count Five**
**Q3 2021 Refund Claim**

92. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

93. Plaintiff is an eligible employer qualified to receive $262,295.08 of ERC in Q3 2021.

94. On or about May 18, 2023, Plaintiff duly filed a Form 941-X claiming an ERC for Q3 2021 in the amount of $262,295.08.

95. Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $262,295.08, along with statutory interest.

**Count Six**
**Attorney Fees and Administrative Costs**

96. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

97. In addition to its refund and statutory interest, Plaintiff is also entitled to its administrative costs, including attorneys' fees.

98. The Defendant must pay reasonable litigation and administrative costs to a prevailing party unless its position in the proceeding was "substantially justified." I.R.C. §

7430(c)(4)(B).

99. Here, the Defendant's position was not substantially justified.

100. In disallowing the claim, the IRS relied upon its own sub-regulatory guidance as though it were law – and deliberately misapplied it – in brazen defiance of the clear language of the CARES Act and I.R.C. § 3134, which requires only a partial suspension of operations due to governmental orders.

101. Plaintiff's entitlement to the ERCs at issue is straightforward. The Defendant's refusal to promptly pay the ERCs is, therefore, not substantially justified.

**JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all issues so triable.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court enter a judgment against Defendant, the United States of America, for:

(A) A tax refund for Q2 2020 representing ERC in the amount of $202,262.51, with statutory interest thereupon;

(B) A tax refund for Q4 2020 representing ERC in the amount of $37,300.07, with statutory interest thereupon;

(C) A tax refund for Q1 2021 representing ERC in the amount of $247,286.58, with statutory interest thereupon;

(D) A tax refund for Q2 2021 representing ERC in the amount of $277,213.45, with statutory interest thereupon;

(E) A tax refund for Q3 2021 representing ERC in the amount of $262,295.08, with statutory interest thereupon;

(F) Reasonable litigation and administrative costs, including attorneys' fees, as allowed by law; and

(G) All other relief as this Court deems necessary.

Respectfully submitted, this the 26th day of March, 2025.

*/s/ Keith B. Franklin*
E.J. SAAD (ASB 8614D51E)

MATTHEW ANDREWS (ASB 1672E47A)
JAMIE F. LEE (PRO HAC)
KEITH B. FRANKLIN (ASB 8196A56K)
*Attorneys for Plaintiff PENELOPE HOUSE, INC.*

**OF COUNSEL:**

**E.J. SAAD LAW FIRM**
6207 Cottage Hill Road, Ste. G
Mobile, AL 36609
Phone: (251) 660-0888
ejsaad@ejsaadlaw.com
mandrews@ejsaadlaw.com
jaimelee@ejsaadlaw.com
k.franklin@ejsaadlaw.com