**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PENELOPE HOUSE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 25-00118-KD-MU** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This action is before the Court on Defendant United States' motion for summary judgment and memorandum in support (docs. 47, 47-1), Plaintiff Penelope House, Inc.'s response (doc. 53), the United States' reply (doc. 59), the United States' supplemental authority (docs. 65, 57), Penelope House's supplemental authority (doc. 66), Penelope House's response to the United States' supplemental authority (doc. 70), and the United States' supplemental authority (doc. 77). Upon consideration and for the reasons set forth herein, the United States' motion is DENIED.

I. Procedural Background

Penelope House brings this action against the United States pursuant to 26 U.S.C. § 7422, to recover Employee Retention Credits - employment taxes including the refundable excess credit with statutory interest - allegedly wrongfully denied by the Internal Revenue Service for the tax periods ending March 31, 2021 (Q1 2021) ($247,286.58), June 30, 2021 (Q2 2021) ($277,213.45), and September 30, 2021 (Q3 2021) ($262,295.08) (Counts One, Two and Three). Penelope House also seeks any allowable attorney fees and administrative costs (Count Four).

II. Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome" of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. Id.

The movant "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). The movant meets this burden by identifying affirmative evidence (pleadings, depositions, answers to interrogatories, admissions on file, etc.) to support its claim that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). If the nonmovant bears the burden of persuasion at trial, the movant may also make a prima facie showing of summary judgment by demonstrating that the nonmovant's evidence is insufficient to establish an essential element of its claim. Grange Mut. Cas. Co. v. Slaughter, 958 F.3d 1050, 1057 (11th Cir. 2020); Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden under Rule 56(c), summary judgment will be granted unless the nonmovant offers some competent evidence that could be presented at trial showing that there is a genuine dispute of material fact. Celotex, 477 U.S. at 324. If the movant meets its burden by pointing "to specific portions of the record ... to demonstrate that the nonmoving party cannot meet its burden of proof at trial," the nonmovant must "go beyond the pleadings" to designate specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." Anderson, 477 U.S. at 248. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw

all reasonable inferences in that party's favor." FindWhat, 658 F.3d at 1307. Thus, summary judgment is only proper when a movant shows that no reasonable jury could find for the nonmovant—even when the evidence and inferences are drawn in the nonmovant's favor.

III. Background

Plaintiff Penelope House is a § 501(c)(3) non-profit corporation that operates a shelter for victims of domestic violence and their families, with its principal place of business in Mobile County, Alabama. Penelope House provides not only food and shelter, but also group meetings with a licensed social worker, a hotline for potential clients, crisis counselors and case managers for the clients, children's program with a program coordinator and child advocate, an advocate at court and at the shelter, community education program through which employees go to schools to educate children regarding domestic violence, transitional living program which provides housing for clients until they can obtain permanent housing, and a thrift store which sells donated items and provides household items to clients moving out of the shelter.

In March 2020, the director began to receive orders regarding Covid 19 from the office of the Governor of Alabama, the State Health Officer, and the Alabama Department of Public Health which included guidance from the Centers for Disease Control (CDC). She also received information and guidance from the Mobile County Health Department. When the director received orders from the Governor's office, the State Health Officer, etc., she went to their websites to read information and obtain printouts to post at Penelope House. She also received information by email from the Alabama Department of Public Health and the Mobile County Health Department which reinforced the information from the CDC.

As the orders were received, Penelope House made significant changes to its operations to comply. In addition to cancellation of group meetings, a substantial amount of staff time was

expended to implement the governmental orders, primarily maintaining quarantine, social distancing, masking, and sanitization (doc. 53, p. 6-17). For example,

> Penelope's shelter also has two large shower rooms. Each room has six showers. [ ] After the COVID-19 governmental orders, only one person or one family unit at a time would be allowed to leave their room and go to the shower room. [ ] Shelter clients would have to communicate with Penelope staff via cell phones (purchased by Penelope) to shower. [ ] '[T]hey would have to call the case manager and say, hey, you know my family is ready to take a shower and we'd have to make sure that there's no other family in there. And then when they would go in, they would have to call when they got back to their room so we could go back and then we could, you know, disinfect the shower room for the next client.' [ ]. After the shower room was sanitized, staff would actually lock it. [ ] This practice continued throughout the first three quarters of 2021 at issue here.

(Doc. 53, p. 8, citations omitted).

And as another example,

> Transportation of clients also changed. If there were five or six people who needed to go to the store, or needed to go to school, social distancing did not allow them all to go in one van; Penelope would have to space them out in separate vehicles on separate trips. [ ] Moreover, between trips, the vehicles would have to be completely sanitized – anything that had been touched by staff or clients. [ ] (Transportation "changed drastically. . . . Simply taking kids to school every day, it would be two van runs, sometimes three, because we couldn't put all of them on the van together as we normally would do").

(Doc. 53, p. 9, citations omitted).

Penelope House explains that the overall number and nights of clients sheltered, meals provided, services provided, and victim support group attendees decreased in the first three quarters of 2021 as compared to the number served in pre-Covid in 2019 (doc. 53, p. 15-16).[1]

---

[1] An exception exists for victim support group attendees for the third quarter of 2021. As compared to 2019, this third quarter showed an increase in attendance. However, in 2019, Penelope House did not offer group therapy for children because the employee who led that group was on maternity leave.

IV. Analysis

The Coronavirus Aid, Relief, and Economic Security Act, PL 116-136, 134 Stat 28, § 2301 March 27, 2020 ("CARES Act") (codified as amended at 26 U.S.C. § 3134, Internal Revenue Code) created the Employee Retention Credit (ERC). The ERC is a refundable tax credit designed to stimulate economic recovery and continued employment. The credit is available to certain eligible employers for the last three quarters of 2020 and for the first three quarters of 2021. Relevant here, "eligible employers" includes tax-exempt organizations as described in 26 U.S.C. § 501(c) and "exempt from tax under section 501(a)". 26 U.S.C. § 3134(c)(2)(A)(i) & (C). An eligible employer may obtain ERCs[2] if it had declining gross receipts, experienced a full or partial suspension of operations "due to" governmental orders … due to Covid 19, or was a recovery startup business. 26 U.S.C. § 3134(c)(2)(A)(ii)(I-III).

Penelope House seeks recovery of the ERCs because it allegedly experienced a full or partial suspension of its operations due to governmental orders issued during the Covid 19 pandemic. To succeed, Penelope House must show that "the operation of the trade or business [… was] … partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." 26 U.S.C. § 3134(c)(2)(A)(ii)(I) (bracketed text added).

---

[2] The amount of ERC is not limited to the amount of employment taxes the eligible employers paid to the Internal Revenue Service. Rather, if the amount of the credit exceeds the applicable employment taxes for the calendar quarter, "such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)." 26 U.S.C. § 3134(b)(3).

The parties do not dispute that Penelope House was operating a trade or business during the period at issue (doc. 47-1, p. 2, n. 1). The parties dispute whether Penelope House meets the elements of the suspension test and dispute which legal theory of causation is invoked by the phrase "due to".

A. Partial suspension

The CARES Act provides that "the operation of the trade or business" must have been "fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." 26 U.S.C. § 3134(c)(2)(A)(ii)(I). Here, the parties dispute whether Penelope House experienced a partial suspension of services.

The United States[3] argues that Penelope House did not experience a suspension of operations (doc. 47-1 p. 6-13). The United States argues that the "plain meaning" of "suspend" is a "stoppage of operations" (Id., p. 7) (citing In re JSmith Civil, LLC, 674 B.R. 207 (E.D.N.C. Aug. 7, 2025)). Since "fully or partially suspended" was not defined in the CARES Act, the

---

[3] The United States cites In re JSmith Civil, LLC, 674 B.R. 207 (E.D.N.C. Aug. 7, 2025), a bankruptcy court decision, for its definition of suspension as requiring a "stoppage of operations" or closure (doc. 47-1, p. 14-16). Penelope House has provided supplemental authority regarding JSmith. Specifically, District Court's decision on the appeal of the bankruptcy court decision (doc. 66, doc. 66-1). Penelope House points out that "the District Court questioned why the bankruptcy court discussed 'partial suspension' at all because the United States 'conceded that a genuine issue of material fact existed about whether JSmith experienced a partial suspension' and the United States' motion was limited to an argument that no appropriate 'orders' were in place." (doc. 66, p. 2). Penelope House further explains that the "District Court itself did not address the meaning of 'partial suspension.' Instead, it remanded the case with instructions for the bankruptcy court to explain, with respect to potential orders from the CDC/OSHA/DOL, whether it granted summary judgment because of a lack of 'orders,' or because of no evidence showing a 'partial suspension' (despite the United States conceding an issue of fact on partial suspension)." (Id.). Thus, Penelope House asserts that JSmith is "limited in its scope to a discussion of 'orders' and not 'partial suspension'" because its discussion of partial suspension may be dicta (Id.).

United States has relied upon ordinary dictionary definitions and the definition of a qualifying employer, to conclude that to be "'partially suspended,' some part of the taxpayer's business must have been switched off" (Id.).

The United States argues that to qualify for the ERC, based upon the suspension test, Penelope House must show its "business could not operate, not just that the pandemic made business operations difficult" (Id.). The United States argues that the "suspension" test is not met by decreased efficiency or modification of procedures due to Covid 19 requirements because the business can operate within those parameters. The United States posits that the "relevant inquiry is whether the business can still function, not whether operations become less convenient or less efficient." (Id., p. 8).

Based upon this inquiry, the United States argues that Penelope House, as an essential business, continued to shelter domestic violence victims, albeit with modifications and protocols in place to meet Covid requirements and that Penelope House's secondary services – court advocates, educational outreach, and the thrift shop – continued after the stay-at-home order, albeit with modifications and Covid 19 protocols (Id., p. 8-10). The United States acknowledges that schools where Penelope House performed its educational outreach, and courts where the court advocates worked with clients, were closed during part of the relevant quarters; but, based on revenue generated by the thrift shop[4] and the number of employees involved in the other two programs, "Penelope House cannot show that the services were more than a nominal part of its business" (Id., p. 11-12).

---

[4] The United States points out that "retail businesses were permitted to reopen with social distancing on November 8, 2020" which was before the three quarters of 2021 at issue (doc. 47-1, p. 12). From this, the United States argues that "[i]f Penelope's Closet remained closed in 2021, that was a choice, not a suspension." (Id.).

The United States also argues that Penelope House found "workarounds" any supply chain issues that it experienced (Id., p. 13). The United States argues that even though Penelope House staff had to go to stores to purchase items because of difficulty obtaining same from bulk distributors, "it cannot point to any evidence that it had to stop operating because of a critical supply shortage" (Id.). The United States also argues that Penelope House has not shown that any governmental order caused the supply shortages (Id.).

Penelope House agrees that the CARES Act did not define "fully or partially suspended" and argues that the Court should look to the common or ordinary meaning. Penelope House argues that "partially" means "in a partial way … to some extent" or incompletely, restricted or "involving only a part rather than the whole" and that "suspended" means temporarily stopped or delayed, interrupted, or terminated (Id., p. 19). Penelope House argues that placing the words together "'partially suspended' means 'a temporary delay, interruption, or termination of a portion of an employer's business'" (Id.) (citation omitted).

Penelope House also relies on IRS Notice 2021-20, 2021-11 I.R.B. 922 ("Guidance on the Emp. Retention Credit Under Section 2301 of the [CARES] Act"), 2021 WL 807026, which advises that "an employer may be considered to have a partial suspension of operations even where the employer continues providing services" and argues that the Court may look to Notice 2021-20 for guidance as to the meaning of "partially suspended." Citing several provisions of Notice 2021-20, including the following,

> If all, or all but a nominal portion, of an employer's business operations may continue, but the operations are subject to modification due to a governmental order (for example, to satisfy distancing requirements), such a modification of operations is considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has more than a nominal effect on the business operations under the facts and circumstances.

Penelope House argues that it meets the "partial suspension" requirement because it satisfies the "nominal portion" test (doc. 53, p. 22-23).[5]

Penelope House also relies upon the congressional history of the ERC as a "standard instrument of disaster tax relief" dating back to 2005 (Hurricane Katrina) (Id., p. 23). Penelope House points out that in several codifications and extensions, the eligibility for the "prior ERCs turned on a business being 'inoperable' as a result of damage sustained by reason of the disaster" but Congress changed that pattern in the CARES Act by finding that a business need only be "'fully or partially suspended'" as opposed to "'inoperable'" (Id., p. 24). Penelope House also points out that Congress contemporaneously re-enacted the "inoperable" standard for natural disasters and "amended and extended the CARES Act ERC with its 'fully or partially suspended' standard' (Id., p. 25). From this Penelope House argues Congress' intent is clear and that "'partially suspended' thus cannot be read to demand the functional equivalent of 'closure' or 'inoperable'" (Id., p. 25)

Penelope House argues that "[a]t a minimum" it "has adduced evidence creating a question of fact for the jury" as to whether its operations were "partially suspended" (Id., p. 25-27). The Court agrees. The Court finds there is sufficient evidence from which a reasonable jury could find that Penelope House's operations were partially suspended. The evidence in support of finding a partial suspension includes at least the suspension of all services once the restricted

---

[5] "Whether a modification required by a governmental order has more than a nominal effect on the business operations is based on the facts and circumstances. A governmental order that results in a reduction in an employer's ability to provide goods or services in the normal course of the employer's business of not less than 10 percent will be deemed to have more than a nominal effect on the employer's business operations." IRS Notice 2021-20 Q/A 18.

capacity was achieved,[6] the temporary suspension of services (14-day quarantine) to clients who had Covid 19, and the suspension of group meetings and counseling, education services, and community outreach services. "A 'partial suspension' is a temporary delay, interruption, or termination of a portion an employer's business. The language is plain, and this interpretation is pursuant to the CARES Act and ERC's goal and does not result in absurdity." Tri-State Memorial Hospital v. United States, No. 2:25-CV-0181-TOR, 2026 WL 1497190, at *4 (E.D. Wash. May 28, 2026) (citing Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'") (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000)); see also Sundancer Pools, Inc. v. United States, No. 25-1291T, 2026 WL 1830419 (Fed. Cl. June 23, 2026) (finding "partial suspension" means "a temporary interruption, postponement, or cessation of a more than nominal portion of a business's operations").

B. Governmental orders

The CARES Act provides that "the operation of the trade or business" must have been "fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." 26 U.S.C. § 3134(c)(2)(A)(ii)(I). Here, the parties dispute whether the orders Penelope House followed were qualifying governmental orders.

---

[6] As Penelope House explained, "The impact was not just theoretical – metrics show substantial decreases in the number of individuals sheltered, the number of nights of shelter, the number of meals served, the number of service hours, and the number of victim support group attendees for the relevant first, second, and third quarters of 2021 as compared to 2019 (the comparison the IRS advised taxpayers to make)." (doc. 53, p. 26).

The United States argues that the federal orders, specifically the "President's Proclamation declaring a National Emergency, and CDC and OSHA public health guidance", were not orders because they either lacked enforcement mechanisms or did not require Penelope House to stop providing services (doc. 47-1, p. 14-15). To reach this conclusion, the United States points out that the CARES Act does not define "orders" and thus, applying the ordinary, common meaning – an order is a "'command, direction, or instruction'" that is compulsory and binding with repercussions and not advisory, or guidance, or a recommendation (Id., p. 14).

The United States argues that Alabama State Health Officer's "Safer at Home" series of orders (social distancing, masking, quarantines, and sanitation), the two "Safer Apart" orders (lifting some restrictions but keeping mandatory provisions for quarantine of individuals positive for Covid 19), and the "Order of the State Health Officer Regarding Non-Congregate Sheltering", all of which were either effective in part or in whole during the relevant time period,[7] "did not require Penelope House to suspend its operations" (Id., p. 16-21). The United States argues that the Safer at Home and Safer Apart orders required only modifications to Penelope House's current operations, which did not rise "to the level of a full or partial suspension." (Id.).

The United States argues that the Non-Congregate Sheltering order did not apply to Penelope House but instead applied only to organizations offering "temporary shelter related to the Covid-19 outbreak" (Id., p. 19). The United States reasons that because Penelope House was in existence before the pandemic it did not offer temporary shelter related to the pandemic (Id. p.

[7] The Safer at Home orders were in effect for the first quarter of 2021 and nine days of the second quarter (doc. 47-1, p. 18). The Safer Apart orders were in effect from April 9, 2021 until May 31, 2021 (Id., p. 19). The Non-Congregate Sheltering order was in effect for the entire relevant time from – first three quarters of 2021.

19). The United States also argues that the Non-Congregate Sheltering order required only modification to Penelope House's procedures (sanitization, social distancing, masking, and quarantine of clients coming from hospitals) but not stopping services or modifications that rose to the level of suspension of services. "And while Penelope House's clientele qualified as individuals with "increased risk," … the order permitted Penelope House to offer congregate shelter to clients who could adhere to social distancing guidelines." (Id.).

Penelope House agrees that an order can be defined as a command, direction, or instruction and acknowledges that the United States prefers command (doc. 53, p. 27). Penelope House explains that other definitions for "direction" and "instruction" indicate that they "may mean something less than an outright command." (Id., p. 28). Penelope House points out that the "IRS's own guidance confirms this: 'Whether orders, proclamations or decrees are governmental orders [under the CARES Act] is determined without regard to the level of enforcement of the governmental order.' *See* Notice 2021-20, Q/A 10." (Id., p. 28, n. 6).

Penelope House argues that the proclamation by Alabama Governor Kay Ivey, which provided that the State Health Officer "shall" inform the public on "protecting themselves" from Covid 19, declared that "'all subsequent orders, laws, rules, or regulations issued pursuant to hereto shall remain in full force and effect for the duration of the public health emergency unless rescinded or extended by proclamation'" was the first order Penelope House received, and that it contained compulsory language requiring compliance for the duration of the public health emergency (doc. 53, p. 30). Penelope House points out that following this proclamation, it received the series of orders from the State Health Officer – Safer at Home, Safer Apart, and the Non-Congregate Sheltering order - which consistently included orders phrased in terms such as "shall take all reasonable steps", "shall be closed", "shall remain in full force and effect", "shall"

take precautions, “shall” be quarantined, “shall not” leave, “shall provide the temporary shelter…” etc. (Id., p. 30-34).

Penelope House also points out that the Governor, in adopting the State Health Officer’s orders and amendments, placed the orders under the Alabama Emergency Management Act, which provided for enforcement by state law-enforcing authorities and a penalty consisting of a fine or imprisonment. (Id., p. 32). And the Attorney General for the State of Alabama issued guidance for law enforcement regarding the State Health Officer orders (Id., p. 35).

Penelope House also argues that it was subject to the Non-Congregate Sheltering order. Penelope House explains that “[p]rior to the pandemic, [it] was a ‘congregate’ shelter for victims of domestic violence and their children” with communal sheltering, but after Covid 19, it “pivoted to a noncongregate shelter so that communal living, showering, and dining were no longer allowed, due to social distancing and other Covid-19 governmental order requirements.” (doc. 53, p. 33-34). Penelope House also points out that

> The Government also contends that “individuals” eligible for non-congregate sheltering under the NCSO were “narrowly defined” and did not include Penelope’s clients. But the NCSO specifically included in the definition of “individuals” eligible for noncongregate sheltering those who “are otherwise at risk in their current living situations (for example, **domestic violence** and sexual assault survivors).”

(Doc. 53, p. 34) (quoting doc. 47-19, ¶ 2.b) (emphasis in original). Thus, Penelope House provided “services using non-congregate solutions” (doc. 53, p. 6-15).

The Court finds that there is sufficient evidence from which a reasonable jury could find that the suspension of these enumerated services was “due to” orders imposed by the State

during the quarters at issue.[8] Specifically, the Safer at Home orders required that employers "shall" take reasonable steps to protect employees and customers and then enumerated specific steps to include suspension of group meetings of more than 10 and requiring 6 feet of separation between persons not of the same household. Moreover, the Non-Congregate Sheltering order was applicable to the services Penelope House offered after the beginning of the Covid 19 outbreak: Penelope House offered temporary shelter in compliance with Covid 19 directives which made the offering of shelter related to Covid-19 outbreak.

The United States' argument that the shelter must have been newly opened for the sole purpose of offering temporary shelter because of the Covid-19 outbreak is without merit. The same is true for the United States' argument that the clients of Penelope House, as a matter of law, were not those with an increased risk of a living situation that inhibited their ability to adhere to social distancing guidelines.

C. Causation

The Cares Act provides that "the operation of the trade or business" must have been "fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." 26 U.S.C. § 3134(c)(2)(A)(ii)(I). Here, the parties offer differing meanings for the phrase "due to".

The United States argues that "[e]ven if Penelope House's modifications meet partial suspension requirements, and even if the government directives it relied on could be considered

[8] As previously stated, the Safer at Home orders were in effect for the first quarter of 2021 and nine days of the second quarter (doc. 47-1, p. 18). The Safer Apart orders were in effect from April 9, 2021 until May 31, 2021 (Id., p. 19). The Non-Congregate Sheltering order was in effect for the entire relevant time from – first three quarters of 2021.

orders, Penelope House still does not qualify for the ERC. It cannot show its operations were fully or partially suspended "due to" the governmental order." (doc. 47-1, p. 21). The United States asserts that Congress' use of "due to" indicates that a claimant must show both factual and proximate causation and not mere but-for causation to argue that the Court should adopt a direct proximate cause standard (Id., p. 21-24).[9] The United States argues that "Penelope House cannot satisfy the suspension test merely by identifying pandemic-related difficulties that occurred while governmental orders were in effect. It must establish a direct causal connection between a qualifying governmental order and the alleged suspension of operations." (Id., p. 22). The United States argues that Penelope House must show that issuance of the orders was the direct and proximate cause of its partial suspension, but Penelope House cannot show a direct link between any specific governmental order and the changes to its operations (Id., p. 22-23). The United States argues that the changes to Penelope House's usual services were part of the "inconvenience related to general pandemic conditions" (Id., p. 24). In other words, caused by factors other than a governmental order.

Penelope House asserts that "due to" means "because of" or "as a result of" which indicates "a but-for causation standard" (doc. 53, p. 37-38). Penelope House asserts that if Congress had intended proximate causation, it would have said so, but instead, it used the "less legalistic language" of "due to" (Id., p. 36-40). Penelope House points out that contemporaneously with creating the ERC, Congress amended a section of the Public Readiness

[9] Relying upon the decision in Northeast Health Services, LLC v United States, 181 Fed. Cl. 566, 581 (May 28, 2026), the United States summarizes the court of claims' reasoning that "a but-for causation standard would permit eligibility to rest on lengthy and indirect chains of causation, expanding the suspension of operations provision beyond its intended scope" and that "[r]equiring proximate causation ensures that the alleged suspension bears a significant direct relationship to the governmental order and prevents the ERC from becoming a regime in which eligibility is presumed absent a clear statutory limitation." (Id., p. 21-22).

and Emergency Preparedness Act (PREP) to add to the "pandemic countermeasures protected by the PREP Act." (Id., p. 37) (citation omitted). Penelope House asserts that the PREP Act contains proximate causation language, specifically, "proximately caused by", but the ERC does not. Instead, Congress chose to use the phrase "due to". Penelope House also argues that Congress' choice of "due to" should be respected and that "[r]eading proximate cause into 'due to' would impermissibly 'add [or] alter … statutory language to require what Congress did not'" (Id., p. 38) (bracketed text in original) (citation omitted).

The Court finds the reasoning in Tri-State Memorial Hospital persuasive. Specifically,

> "Due to" is not defined in the statute. 26 U.S.C. § 3134. This Court must begin with the text of the statute to determine if the plain language is unambiguous. United States v. Torres, 995 F.3d 695, 703 (9th Cir. 2021). Both Plaintiff and Defendant agree that the plain meaning of "due to" is "because of." … The meaning is plain and unambiguous. The Court is not required to interpret this statute further. Connecticut Nat. Bank v. Germain, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' ") (quoting Rubin v. United States, 449 U.S. 424, 430 (1981)).
>
> However, Defendant argues that "due to" has an expansive meaning in law. … (citing U.S. Postal Serv. v. Postal Regul. Comm'n, 640 F.3d 1263, 1267 (D.C. Cir. 2011). Defendant contends that this includes a proximate cause requirement. … This requirement means that the event must be the "proximate, independent, and sufficient cause." Id. Defendant relies on the Tax Code, tax case law, and administrative materials to support this interpretation. …
>
> Plaintiff states that "because of" required only a but-for causation requirement. … Plaintiff relies on Supreme Court and Circuit Court interpretations for support. Id. For example, Plaintiff cites Burrage v. United States, 571 U.S. 204, 216 (2014), where the court recognized a "but-for" requirement for a statute stating "because." …
>
> Other Courts agree with this interpretation. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009) (recognizing that "because of" and similar phrases supports a "but-for" requirement); Burrage v. United States, 571 U.S. 204, 216 (2014); Thomas v. CalPortland Co., 993 F.3d 1204, 1209 (9th Cir. 2021) (recognizing

> Supreme Court precedent and follows that precedent that states that "because of" and similar language supports a "but for" causation requirement). Defendant's interpretation improperly adds words into the statute. It asks us to add words to the law to produce what is thought to be a desirable result. E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768, 774 (2015) (stating that wrong interpretations are typically caused by adding words "to produce what is thought to be a desirable result."). Accordingly, the Court recognizes that "due to" requires "but-for" causation.

Tri-State Mem'l Hosp., 2026 WL 1497190, at *7 (citations to docket omitted). Accordingly, for purpose of this order and for trial, the Court finds that "due to" has the plain meaning of "because of" (Id.).

V. Conclusion

For the reasons set forth herein, the United States' motion for summary judgment is DENIED.

DONE and ORDERED this the 25th day of November, 2026.

s/ Kristi K. DuBose
KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE